STEPHEN W. BALLOU *vs.* OSBORN J. BALLOU, Guardian.

JANUARY 31, 1910.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1)  *Evidence.  Mental Condition.*

Testimony of conversation held by witness with deceased ward of appellee was offered for the purpose of showing the mental condition of ward; the evidence was not submitted to the court for its determination as to its tendency to show such condition, nor was the objection to the offering of such evidence met in any other manner, and witness was permitted to fully express his opinion as to the ward's mental condition:—

*Held,* that, in such circumstances, the conversation was properly excluded.

(2)  *Evidence.*

On an appeal from allowance of the account of a guardian, testimony as to the condition of the property, and how it got into its present condition, which extended over a period prior to the time the guardian took charge, including the fact that the title was in litigation, was properly admitted, the discretion of the court as to confining such evidence within reasonable limits not being exceeded.

(3)  *Evidence.*

On an appeal from allowance of an account of a guardian, on the issue as to whether the guardian made a profit on stone carted from the farm, evidence of a witness to show that witness could have carted stone from *his* farm at a profit was properly excluded as immaterial.

APPEAL from allowance of guardian's account. Heard on exceptions of appellant, and overruled.

DUBOIS, C. J.  These are appeals from the decrees of the Probate Court of the town of Cumberland allowing, respectively, the first and final account of Osborn J. Ballou, guardian of the person and estate of Charles H. Ballou, late of said Cumberland, deceased.  The cases were tried together, before a justice of the Superior Court and a jury, and verdicts were rendered for the appellee, each sustaining the decree of the Probate Court.  The appellant's motion for a new trial in each case, upon the ground that the verdict therein was against the law and the evidence as to each and every issue submitted to the jury, was denied by the justice who presided at the trial; and

the cases were heard together in this court, upon the appellant's bills of exceptions, each based upon the following grounds:

"*First*.   That said verdict was against the law and the evidence and the weight thereof.

"*Second*.   During the course of the trial His Honor ruled that the appellant could not relate conversations held with Charles H. Ballou for the purpose of showing the mental condition of said Charles H. Ballou.   And he now claims said ruling was erroneous and contrary to law.   Ruling and exception p. 195 and 196 of transcript, and also as to the testimony already submitted by the appellee as to the mental condition and conversations of said Charles Ballou, all as disclosed in said transcript.

"*Third*.   During the course of the trial His Honor ruled that the appellee was entitled to show the title to the ward's property and the condition of the same previous to the period covered by the accounts in litigation at said trial.   The appellant excepted to said ruling and now claims the same was erroneous and contrary to law, pp. 220, 221 and 222 of said transcript.

"*Fourth*. ˙ During the course of the trial the appellant's counsel asked witness, Walter E. Cook, the question, 'could you cart those stones at a profit from there to the crusher?' Said question was objected to and ruled out by His Honor. The appellant excepted and now claims that said ruling was erroneous and contrary to law, pp. 285 and 286 of said transcript.

"*Fifth*.   During the course of the trial the appellant's counsel asked said witness, Walter E. Cook, the following question, 'Are you able from your experience in carting stone, to form an estimate of the probable profit for anybody carting those stone, carting stone from those particular walls with which you are familiar, to the crusher located on the same farm where the crusher was in question?'   Said question was objected to, and the objection was sustained, and exception noted in behalf of the appellant.   He now claims that said ruling was erroneous and contrary to law, p. 293 of said transcript."

A careful examination of the transcript of the evidence fails to disclose any reason for considering the cases at bar to be exceptions to the general rule announced in *Wilcox* v. *R.' I. Co.*, 29 R. I. 292, and therefore the appellant's exception in each case, that the verdict therein is against the evidence and the weight thereof, must be overruled.

(1)     The first exception was taken while the appellant was testifying, in direct examination, in answer to the following questions: "Q. 91. When did you have a conversation with Charles last, before he died? A. Oh, I can't tell just the time. I used to meet him in Manville, getting shaved. I used to go down Cumberland Hill and meet him. Q. 92. Give us some rough idea? A. A year and a half ago, I should say. It might not be more than a year. I can't remember exactly, and it is not much more than a year ago that I saw him, one day, and I took some very nice apples—

"MR. SWAN—I think the witness should be cautioned not to give any conversations that he had with Charles Ballou.

"MR. CUSHING—Why can't he give conversations to show the mental condition?

"MR. SWAN—He can give his conclusions, but he certainly can not give the conversations. I object to that question.

"MR. CUSHING—Didn't you put in conversation?

"MR. SWAN—I object to that question. You had a right to object to them if you had wished to.

"MR. CUSHING—They were not objectionable.

"MR. SWAN—His inferences from his conversation, but not the conversations themselves, certainly are not admissible under any of the rules of evidence that I know of, and knowing what that answer is, from previous trials of this case in the Probate Court, I think it is a fair thing to say that it is not to show his mental condition at all, if I have the answer in mind that was made to that question,—at all, it is not an attempt to show the mental condition at all.

"THE COURT—It seems to me, this is your witness, it seems to me you have a right to ask him what his opinion was in regard to the degree of mentality, if I may put it that way, that Charles Ballou had, whether he was,—what degree of soundness of mind, and so forth, and generally you have a right to ask

this man on what he bases his opinion without going into detail, that is, his relationship, the fact that he has seen him and has had conversation, but I don't think you are required to substantiate the statement of your own witness by details of that kind. I think on cross-examination you have a right to go into those matters, but I think that this man, your own witness for that matter, is simply entitled to give his opinion and generally speaking the reasons on which he bases it, consequently I shall rule that he is allowed the utmost liberty in stating his idea of Charles's mental condition, but, as for giving his reasons in detail, going into detail of the conversation with him to show why, I don't think it is proper (and) in direct.

"Exception is noted in behalf of the appellant."

In addition to the foregoing, the witness testified as follows: "Q. 93. (By MR. CUSHING.) What was his mental condition, right up until a short time before he died? A. Well, I didn't see any great change in him. Q. 94. Up until how long before he died? A. Well, within a year or so. Q. 95. On what do you base that opinion? A. Well, I see him round, see him doing about the same thing, and moving around same as he always did."

The appellant was not injured by this ruling. He was allowed to fully express his opinion as to the mental condition of the deceased ward of the appellee. The objection was based upon the ground that the conversation in question would not tend to show the mental condition of the ward at all, and that objection was not met in any way, either by submitting the same to the judge for his determination or in any other manner. The conversation in such circumstances was properly excluded.

(2) The third exception also arose while the appellant was testifying, on cross-examination, as follows: "C. Q. 262. As a whole, should you say that the buildings had depreciated? A. Yes; I don't think they are in so good order as they were when he took them. C. Q. 263. This property, after your father's death, went to your mother? A. What? C. Q. 264. After your father's death this went to your mother, this farm? A. No; it was given to us boys. C. Q. 265. Given to you three boys, Charles and Osborn and yourself, by whom?

A. By my father, through will.   C. Q. 266.   When did your father die?   A. My father died 33 years ago.   C. Q. 267. What was the condition of that property from the time your father died for the next ten or twelve or fourteen years, who had charge of it?   A. I suppose my brother had everything. C. Q. 268.   Did he have control of that property?   A. Yes; I didn't.   C. Q. 269.   Where was the title to the property?

"MR. CUSHING—Is that a proper question to ask him?

"MR. SWAN—I think so, to show the condition of those buildings.   It has been shown that there has been a decided depreciation in that property since Mr. Ballou went there. We propose to show who had charge of the property, and who was responsible for its getting into the condition it is.   We admit it was not in the shape that it was when the father lived there.

"THE COURT—Is it necessary to go away back that far? Does it make any difference,—assist us in arriving at a conclusion between these parties, to know what the condition of this property was twenty years ago?   Is it not sufficient for our purposes that we know what the condition was in 1900, and what its condition was in 1907?

"MR. SWAN—They have shown that that property has run down, and decidedly run down, since he came to that place. We wish to show how it ran down, who was the owner of it, and where the title of it was, and who was responsible for it.   Mr. Cushing knows the circumstances.

"MR. CUSHING—Your own witness brought that out.   We didn't bring that out.   Your own witness testified about the property steadily running down hill, but it does not seem to me that it is a proper issue to go clear back and trace those buildings back to the earliest stages.

"MR. SWAN—I wish to show simply this, that the property, for a great many years after the death of Mr. Ballou, was in litigation and not in the control of anyone who was accountable for that condition of it, and that it was during those ten or twelve or fifteen years that the property did depreciate, and Mr. Ballou took it after that decided depreciation.

"THE COURT—If you confine yourself to that. I don't want to go back through that litigation, but if it is understood that we are simply sticking close to the question of the condition of the farm, how it got into that condition, without going into the trouble that preceded the year 1900.

"MR. CUSHING—Here is a witness, that was put on the stand by them, that simply made the general statement that this property has been steadily running down hill since the death of the father.

"MR. SWAN—On cross-examination.

"MR. CUSHING—Now then, the only pertinency of that would be such portion of it as covers this period from 1900 down to the present time,—would be pertinent to this case. We are not going back further than that, or it would seem to go back,—in fact, we are not prepared to introduce testimony along that line, as we might have done if we had supposed this was going to come in.

"THE COURT—To a certain extent there was some testimony here that this farm,—had been allowed to deteriorate, and it may be that argument later may be made that that deterioration was due to Osborn Ballou's failure to act as he should have done, consequently the rental value has been reduced, and if that is an argument which may fairly be made from the evidence as it stands, it does seem to me that we have a right, in a general way, to know how the property got into that condition that it has been in for the last eight or ten years. Subject to the ruling that we are not to go into all the details, I think you have a right, in a general way, to show how the property got into its present condition. I will note your exception, Mr. Cushing.

"Exception is noted in behalf of the appellant.

"C. Q. 270. (By MR. SWAN.) Is it true, Mr. Ballou, that that property was in litigation for twelve or fourteen years, and that it was finally sold at a master's sale? A. Yes. C. Q. 271. And your mother was occupying the place at that time? A. Yes. My brother was managing. He came there, he kept his cart there and came to look out for it. He was there every day. I was driving a meat cart at that time. C. Q. 272. He came

there when?   A.  Most every day.   C. Q. 273.   What time was that?   A.  Within that time; he had cows there, killed them, and changed them.   C. Q. 274. Who got, at the master's sale, who purchased that property?   A.  A man by the name of Mr. Meers.   C. Q. 275.   How did it come back into the Ballou family, into your brothers Charles and Osborn?   A.  Well, I suppose, I never knew of that transaction.   It was all done blind to me."

There is no merit in the exception.   It was clearly within the discretion of the trial court to allow testimony to be introduced concerning the circumstances surrounding the transaction, including the fact that the title to the property was in litigation, within reasonable limits, and we do not find that such discretion was exceeded.

(3)   The fourth exception arose during the direct examination of Walter E. Cook as a witness  for the appellant, as follows: "Q. 3.   What is your business?   A.  Farmer.   Q. 4.   Where is your farm located with reference to the two Ballou farms mentioned here?   A.  About a mile and a half this side.   Q. 5. Now, at the time the crusher was located on Osborn Ballou's farm, did you, or not, cart stone there?   A.  Yes;  I drawed a few.   Q. 6.   Where did you draw from?   A.  From my farm. Q. 7.   A mile and a half away?   A.  Yes.   Q. 8.   Whether or not you could draw stone that distance at a profit to the crusher?   A.  Yes.

"MR. SWAN—Just a moment.  I object.  The conditions have not been shown to be at all similar.

"THE COURT—I think that the objection is well taken.

"MR. SWAN—I ask that that answer be stricken out.

"MR. CUSHING—I don't think that there can be anything easier than to show if he can do it at a profit.

"MR. SWAN—I object to that remark.

"THE COURT—It seems to me that, going  into what the conditions were on Mr. Cook's farm, it might be possible that he could do things at a profit where another man might not. There should be shown some similarity in conditions.

"Q. 9. (By MR. CUSHING.)   You say you had to draw stone a mile and a half?  A.  Yes, sir.   Q. 10. Where did you get

them from on your farm?    A.  I got them on the walls.    Q. 11.
You took them from the walls?    A.  Yes.    Q. 12.  Could you
cart those stones at a profit from there to the crusher?

"MR. SWAN—I object to that.

"MR. CUSHING—He says he took them off the walls.

"MR. SWAN—He says he took some stones from the wall on
his place and drew it to the crusher.    Whether he could do that
at a profit, I submit that the one question in this case is whether
or not Mr. Ballou could have made a profit, or could reasonably
have made a profit, from the stones which he took off this farm.

"THE COURT—I think that is right, but I think you could
find out what price was paid to Mr. Ballou for his stone and
you could show by figuring what it cost him for labor and all
those elements, and then it comes down to this, whether this
particular man actually made a profit or could have made a
profit, or should have made a profit.    For instance, Mr. Cook
might have put in his own time, or a dozen different elements
might have entered into his case which did not enter into the
other man's.    The conditions are different, and it seems to me
it is possible to show what was paid per ton, what it cost for
the teams, labor, and that sort of thing, how much time he put
in there, to show whether or not his statement is correct, or
not.    I will note your exception to my refusal to allow the
question of this kind.    Strike out the answer that he has
already given to it."

Whether the witness could cart stones from his walls to the
crusher with profit, or at a loss, was immaterial, and could throw
no light upon the point in issue.    The question was clearly im-
proper, irrelevant, and immaterial, and was properly excluded.

The fifth exception also arose during the examination of
Walter E. Cook, as follows: "Q. 29.  You have already said you
are familiar with those walls on the Osborn J. Ballou farm, the
ones carted to the crusher?    Yes; I have seen them walls.
Q. 30.  Are you able, from your experience in carting stone, to
form an estimate of the probable profit for anybody carting
those stones, carting stone from those particular walls with
which you are familiar, to the crusher located on the same farm
where the crusher was in question?    Objected to; objection

sustained and exception noted in behalf of the appellant. Q. 31. Are you familiar with rental values up in the neighborhood of Cumberland Hill, so as to be able to give an estimate of the fair rental value for the Osborn J. Ballou farm, per year? A. Well, do you want me to tell what I think about it? Q. 32. Yes; I am asking what your opinion is?''

Question 30 was not in itself objectionable, as the answer thereby called for could either be yes or no. It was only a preliminary question, and should have been followed by other questions tending to elicit information that might enlighten the jury upon the matter in dispute. But the matter was allowed to drop there, and no material questions were asked and excluded upon which exceptions were taken. Even if the ruling of the court was erroneous in excluding the question, no harm was done thereby.

The appellant's exceptions are therefore overruled, and the cases are remitted to the Superior Court, with direction to enter a decree in each case in accordance with the verdict, and for further proceedings.

*Page & Cushing,* for appellant.

*Edwards & Angell,* for appellee.

*Edward P. Jastram, Frank H. Swan,* of counsel.